This is an appeal from a judgment of conviction and sentence on a trial by a jury under a count of a two-count indictment in which defendant was charged with the unlawful possession of a named controlled substance, which the undisputed evidence showed was a controlled substance proscribed by the Alabama Uniform Controlled Substances Act. The other count of the indictment had been nol-prossed. After notice of invocation by the State of the Habitual Felony Offenders Act, a sentence hearing was conducted in due course that resulted in a sentence to imprisonment for fifteen years.
We summarize the pertinent facts by quoting from appellant's brief as follows:
 "Al Tucker testified for the State, on direct examination, that he is currently a Police Officer with the Saraland Police Department and has been serving in that capacity for approximately nine months. However, on or about the 11th day of October 1982, he was a Prichard Police Officer. . . . *Page 192 
 "On or about the 11th day of October, 1982, at approximately 7:30 p.m. he received a signal twenty-eight; and, as a result of that transmission, went to a residence at 217 Foley Street at which time he met up with Officer Ragland in another car. He and Officer Ragland seemed to arrive simultaneously, and, when they both got out of their vehicles they were met by two or three juveniles who said, `he's around here.' As a result of the juvenile's statements they went around to the back of the building there on Foley Street and observed a black female weighing between 300 and 400 pounds sitting on top of a black male with her knees across his chest.
 "The black male appeared lethargic and his speech was slurred; and, he did not appear to be making much of an effort to get out from underneath the lady. At the time he [Tucker] tried to get the lady to get off of the subject and she refused to do so, saying that she was going to kill him because he was messing with her kids.
 "In addition to he and Officer Ragland there were 20 to 25 other people standing around within 10 feet or so of where the lady had the man pinned down on the ground. He [Officer Tucker] finally cajoled the lady to get off the man's chest and the subject at that time was asked to stand up. The man, whose name was Files [the appellant], stood up and appeared lethargic, unsteady on his feet, and intoxicated. At that point he was advised that he was under arrest to put his hands behind his back so he could be cuffed. When Files was told to put his hands behind his back he went around unusually fast, and, this frightened Tucker as at that point there had been no pat-down for weapons.
 "As Tucker was trying to put handcuffs on the subject, a bag of pills fell down on the ground behind the subject's feet. It was a handiwrap type bag with 15 or 20 pink and blue pills in it. As it fell to the ground Ragland and he both went for it to try to retrieve it; however, a young black male approximately 16 to 18 years of age grabbed it from them. At that point, they both grabbed the kid's arm and told him to let go of the bag. The bag never left his sight. No one else touched the bags besides he, Ragland, and the young black male.
 "At that point he [Tucker] told the subject Files that he was under arrest for possession of controlled substances and transported him to the jail in Prichard. And after a full search of the subject a syringe was found in his sock. All of these above events occurred in Mobile County.
". . . .
 "On cross-examination he [Tucker] testified that although he believes the 300 to 400 pound female's first name was `Bertha' he does not know her last name. She was standing approximately three feet away from him as he was trying to get the subject handcuffed. Ragland was standing there also; but will not be in court to testify as he is at a funeral escort in Prichard. He doesn't know the young black male's name who reached and grabbed the pills; although it wasn't Mr. Files who grabbed them. There were 20 to 30 people standing around at the time all of this was going on."
Four issues are presented in appellant's brief. We proceed to consider them in the order presented by appellant.
 I.
Appellant's first issue is thus stated:
 "THE TRIAL COURT'S DETERMINATION THAT THE PROSECUTION COULD PROCEED TO QUESTION A WITNESS WITH REGARD TO STATEMENTS MADE BY A THIRD PARTY TO THE EFFECT THAT THE THIRD PARTY WAS GOING TO KILL THE APPELLANT BECAUSE `HE HAD BEEN MESSING WITH HER KIDS' WAS ERROR, WITH THE TRIAL COURT'S DENIAL OF MOTIONS FOR MISTRIAL AND MOTIONS TO STRIKE REQUIRING REVERSAL ON APPEAL." *Page 193 
The issue is directed at the following portion of the direct testimony of Officer Al Tucker as to what he observed and heard while the black female was sitting on top of the black male, the appellant:
"Q. Did you notice anything unusual about Mr. Files?
 "A. He appeared lethargic and he was slurred speech at that time and he wasn't making much of an effort to get out from underneath her.
"Q. What did you do?
 "A. At that time I talked to her a second trying to get her to get off which she wouldn't do. She said — she told me —
 "MR. BERTOLOTTI [Defendant's attorney]: I object to what other people may have said.
"THE COURT: This is the scene. Overrule.
 "MR. BERTOLOTTI: Judge, it's still hearsay. I also object on the grounds that it's not relevant to this charge.
 "THE COURT: Wasn't your client present? Wasn't the defendant?
 "MR. THEDFORD [Counsel for the prosecution]: Yes, sir.
 "THE COURT: Overruled. Go ahead. "Q. What did she say?
 "A. She told me that she was going to kill him because he was messing with her kids.
 "MR. BERTOLOTTI: Judge, I'm going to object again. I've already tried to object on the grounds that it's trying to put in evidence of wrong doing by the defendant not relevant to this charge. And I'm going to object again. I'm going to move to strike the answer and I'm going to move for a mistrial.
"THE COURT: Denied."
Appellant's attorney makes a strong argument by which he contends that the trial court committed error prejudicial to defendant in ruling as it did as quoted above in connection with this particular issue. We find some merit in appellant's contention that what was said by the black female was objectionable as incompetent, irrelevant, and immaterial and of a nature prejudicial to defendant in its tendency to show prior criminal conduct by defendant, but we are unable to conclude that the trial court committed reversible error in any of its rulings as to this issue, after a full consideration of the somewhat perplexing colloquy among the trial judge, the witness, and the attorney for each of the parties on the subject. From the material quoted above, it is to be noted that counsel for defendant first objected "to what other people may have said" and argued that "it's still hearsay." This was the first objection to the testimony as to what was taking place between the black female and the black male. If the fact that the black female did have the black male underneath her was proper evidence, it would seem that what she was saying at the time was admissible as a part of the res gestae of such occurrence, and we cannot find that the trial court committed error in overruling defendant's objection on the ground that the evidence then sought to be introduced was hearsay. It should be noted also that defendant's attorney did not object to the specific question as to what the black female said until after the question was answered.
Whether the trial court committed error prejudicial to defendant in its ruling or rulings invoked by defendant as to the answer of the witness that she told him "that she was going to kill him because he was messing with her kids," requires further consideration. It is to be noted that thereupon, defendant's attorney, in three sentences, said that he was "going to object again . . . move to strike the answer and . . . move for a mistrial." The court's ruling was in one word, "Denied." We are inclined to think that the court should have stricken the answer of the witness as to what the three hundred or four hundred pound female had said, but we do not think that the court was in error in denying defendant's motion for a mistrial. If defendant had desired a separate ruling from the trial court on his motion to strike the answer of the witness, he should have separately invoked such a ruling and given the trial court an opportunity to rule thereon *Page 194 
before saying, "I'm going to move for a mistrial."
 II.
Appellant's second issue is as follows:
 "EVIDENCE SEIZED FROM THE APPELLANT WAS THE FRUIT OF AN ILLEGAL ARREST AND THE TRIAL COURT'S DENIAL OF DEFENSE MOTIONS TO SUPPRESS THE INTRODUCTION OF THIS EVIDENCE WAS REVERSIBLE ERROR."
In support of this issue, appellant argues at length with references to a number of authorities in support of his position, that appellant-defendant was placed under arrest by Officer Tucker of the Prichard Police Department for public intoxication soon after Officer Tucker observed his being held down by the three hundred or four hundred pound female, that such was an illegal arrest for a variety of reasons asserted by appellant among which were, that the place he was arrested was not a public place, that appellant was not manifesting himself in any of the ways proscribed by the statute of Alabama on the subject of public drunkenness, that a Prichard City Ordinance relied upon by appellee is unconstitutional and that no offense was committed by appellant in the presence of Officer Tucker or Officer Ragland.
We find it unnecessary to pass upon the question as to whether any crime was committed by the appellant prior to the moment the bag of pills constituting a controlled substance was observed and seized by the arresting officer or officers. It is clear that at that time they had probable cause for believing he was guilty of the felony of possession of a controlled substance and the particular controlled substance was not the fruit of an illegal arrest. There are some phases of the evidence that may be confusing as to the exact time and the particular circumstance of defendant's arrest or arrests, but, contrary to the position of appellant now under consideration is the following testimony of Officer Tucker on the hearing out of the presence of the jury on defendant's motion to suppress:
"A. Yes, sir, she got off of his chest.
 "Q. Did she do that willingly or did you have to help her up?
"A. No, she got off willingly.
"Q. Okay. What did you see at this time?
 "A. Well, we told him to stand up. He appeared to be intoxicated laying there on the ground. So, I intended to arrest him for public intoxication. As he stood up, told him to put his hands behind him and Officer Ragland and I stepped — both went around toward the back to grab an arm as he stood up, put his arms behind him — as he put his arms behind him, we both observed at the same time as he put his hands back like this, he stuck his hand in this pocket and then come out with glassine bag and let it slide down his leg and hit the ground.
"Q. You say glassine bag. Is it a clear bag?
"A. Right. Like a handi-sandwich bag.
 "Q. Did you have occasion to observe what was in the bag?
 "A. Yes, sir; there was a number of pink pills, a number of blue pills.
 "Q. And based upon your training and experience as a police officer, did you have an opinion as to what they were?
 "A. Yes, sir; I thought that was a combination of T's and blues or talwin and antihistamine combination.
"Q. What did you do then, Officer?
 "A. Placed him under arrest, put the handcuffs on him, and at that point I did a pat-down search and a further search for weapons since I hadn't had the opportunity and I think I came up with, out of his sock, the syringe."
We think the trial court was justified in concluding, as it apparently did, that the seizure of the controlled substance was not a fruit of an illegal arrest. Although the evidence was to the effect that Officer Tucker intended to arrest appellant for public intoxication, the actual discovery by the officers of the controlled substance was in the process of their understandably and legally endeavoring to separate, one from *Page 195 
the other, the two participants in an apparent breach of the peace, which came within their authority and duty as law enforcement officers. The transcript shows the trial court thoroughly considered the evidence presented on the defendant's motion to suppress and apparently realized that some of the testimony on the particular point was confusing, as indicated by the following observation by the trial court:
 "THE COURT: I understand that. And Officer, didn't you say — there is no need for me to get into all of this. All you said —"
Officer Tucker answered the court by the following:
 "THE WITNESS: For purpose of clarification, I might say, I hadn't said, you're under arrest. I just thought to myself mentally, place him under arrest."
In our opinion, the trial court was correct in denying defendant's efforts to suppress the evidence pertaining to the controlled substance that dropped from the person or the clothing of defendant just after he had been separated from the overpowering woman who had been on top of him.
 III.
This issue is captioned in appellant's brief as follows:
 "THERE WAS INSUFFICIENT EVIDENCE TO ALLOW THE CASE TO BE PRESENTED TO A JURY, A FAILURE TO PROVE A PRIMA FACIE CASE AND A FAILURE TO PROVE THE ALLEGATIONS OF THE INDICTMENT, AS THE APPELLANT WAS NOWHERE IDENTIFIED AS THE PERPETRATOR OF THE CRIME IN QUESTION."
In support of this contention, appellant states in his brief the following:
 ". . . Yet, it affirmatively appears from the evidence that the State adduced at trial that there was no proof put forth that the man in court was one John Norman Files; or, that someone named John Norman Files possessed the subject Pentazocine on or about the date in question. A review of the transcript will show that at no time did Officer Tucker identify the Appellant as being the man that he was trying to handcuff to arrest for public drunkenness on the day in question; and, on the day that he found the pink and blue pills laying on the ground."
On the contrary, the transcript shows the following during the cross-examination by defendant of Officer Tucker:
 "Q. All right. Now, you say after she [the three or four hundred pound female by the first name of Bertha] got off of the defendant, John Norman Files, where was she standing?
"A. Behind us.
"Q. How faraway?
"A. Three feet.
 "Q. Now, I believe you said that Officer Ragland accompanied you around the back of the house on that occasion; is that correct?
"A. Yes, sir.
 "Q. And when all this occurred, he was also standing right next to John Norman Files?
"A. Yes, sir."
The foregoing suffices for us to determine the third issue of appellant adversely to him.
 IV.
The final issue presented in appellant's brief is thus stated:
 "IT WAS REVERSIBLE ERROR TO GRANT THE STATE'S MOTION TO PROCEED UNDER THE STATE OF ALABAMA HABITUAL FELONY OFFENDERS STATUTE, AS WELL AS BEING REVERSIBLE ERROR TO TREAT THE APPELLANT'S CONVICTION FOR POSSESSION OF PENTAZOCINE, A VIOLATION OF THE UNIFORM CONTROLLED SUBSTANCES ACT, AS A CLASS C FELONY FOR THE PURPOSE OF THE HABITUAL OFFENDER ACT."
With commendable candor, appellant's attorney concedes, as did defendant's attorney on the sentence hearing, that the *Page 196 
same issue was determined adversely to appellant-defendant inMotley v. State, Ala. Cr. App., 409 So.2d 945 (1982). We adhere to what was held in Motley v. State and note also that the punishment fixed by the sentence of imprisonment for fifteen years did not exceed the maximum prescribed by Code of Alabama 1975, § 20-2-70, "upon conviction, for the first offense under the Alabama Uniform Controlled Substances Act, as specifically prescribed by § 20-2-70," and that the range of punishment as enhanced by his two previous felony convictions (one for burglary in the second degree and the other for manslaughter) under the Habitual Felony Offenders Act, §§ 13A-5-6 (a)(1) and13A-5-9 (b)(1) is "for life or not more than 99 years or less than 10 years." It seems therefrom that the trial judge was not materially influenced by the Habitual Felony Offenders Act in fixing defendant's punishment, inasmuch as irrespective of such Act he could and should have been influenced by the two previous felony convictions to increase the punishment from what it would have been if defendant had not been previously convicted of a felony.
The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
All the Judges concur.